[Cite as *In re C.F.*, 2014-Ohio-5631.]

**IN THE COURT OF APPEALS OF OHIO**
**THIRD APPELLATE DISTRICT**
**SHELBY COUNTY**

IN RE:

    C.F.,                                     CASE NO.  17-14-16

**ADJUDICATED ABUSED,**
**NEGLECTED, AND DEPENDENT CHILD.**

                                        **O P I N I O N**

**[TOM MORRISON - APPELLANT].**

**Appeal from Shelby County Common Pleas Court**
**Juvenile Division**
**Trial Court No. 2011-ABU-0007**

**Judgment Affirmed**

**Date of Decision:  December 22, 2014**

**APPEARANCES:**

    *Scott A. Kelly*  for Appellant

    *Brandon W. Puckett*  for Appellee

**WILLAMOWSKI, P.J.**

{**¶1**} Appellant Tom Morrison ("Morrison") brings this appeal from the judgment of the Court of Common Pleas of Shelby County, Juvenile Division, terminating his parental rights and granting permanent custody to appellee Shelby County Department of Job and Family Services, Children Services Division ("the Agency"). Morrison challenges the judgment claiming that the trial court did not accurately consider the statutory factors set forth in R.C. 2151.414(D)(1). For the reasons set forth below, the judgment is affirmed.

{**¶2**} In October of 2003, C.F. was born to Rose Fisher ("Fisher") and Morrison. R. 1. Between the years of 2008 and 2009, C.F. was sexually abused by Fisher's then boyfriend, Jeffery Wullenweber, who was later convicted of gross sexual imposition for his conduct towards C.F. R. 2. C.F. then engaged in sexual contact with another child the same age as C.F. in 2010. In 2011, allegations were made that Fisher's new boyfriend, Jeremy Brookhart ("Brookhart"), attempted to touch C.F. over her clothing. *Id.* A criminal investigation occurred, but no criminal charges were pressed. *Id.* However, on March 11, 2011, the Agency filed a complaint alleging that C.F. was an abused, neglected, and dependent child and requested temporary custody. R. 1. The accompanying affidavit requested an order of protective supervision so that the Agency could provide services to the

family. R. 2. An initial hearing was held on March 24, 2011, and C.F. remained in Fisher's custody at that time. R. 17.

{¶3} On April 5, 2011, the Agency filed an initial case plan with a permanency goal of preventing the removal of C.F. from Fisher's home. R. 25. The case plan provided for counseling for C.F. and for family coaching for Fisher. *Id.* at 2. No services were listed on the plan for Morrison. *Id.*

{¶4} The adjudicatory hearing on the complaint was held April 8, 2011. R. 31. Fisher and Morrison both agreed that C.F. was dependent and needed the counseling due to her prior history of being sexually abused. *Id.* All of the parties agreed that C.F. should remain in the custody of Fisher under the protective supervision of the Agency. *Id.* The parties also waived the waiting period between the adjudication and the disposition. *Id.* The trial court then found that C.F. was a dependent child and that she would remain in the custody of Fisher with the Agency having protective supervision in order to provide services to C.F. *Id.*

{¶5} On September 2, 2011, the Agency filed a motion for an emergency no contact order between Brookhart and C.F. R. 36. The motion alleged that Brookhart had been arrested on July 6, 2011, on multiple charges of gross sexual imposition and rape involving minor children. *Id.* Despite the fact that Brookhart

remained in jail, Fisher was allowing C.F. to have telephone contact with Brookhart. *Id.* The motion was granted that same day. R. 37.

{¶6} On September 7, 2011, a semiannual administrative review of the case plan was conducted. R. 38. The review indicated that family coaching services had been terminated on May 16, 2011, as the counsel felt the services were no longer needed. *Id.* Due to the new information concerning Brookhart, the Agency was requesting that services be restarted. *Id.* No progress reports had been received from C.F.'s counselor. *Id.* The Agency noted that some progress had been made towards the case plan goals. *Id.* The Agency indicated that there was no need to remove C.F. from Fisher's custody at that time. *Id.* Again, no services for Morrison were determined to be necessary. *Id.* On October 7, 2011, the Agency sought to amend the case plan. R. 39. The amendments requested were to remove Brookhart from services, to require a psychological evaluation of Fisher, and to establish a no contact order between Brookhart and C.F. *Id.* Yet again, no services were listed for Morrison in the case plan. *Id.* A hearing on the review and requested amendments was held on October 12, 2011. R. 41. The trial court approved the amended case plan and C.F. remained in Fisher's custody. *Id.*

{¶7} The next semiannual administrative review of the case plan occurred on March 7, 2012. R. 47. The review indicated that Fisher and C.F. were making some progress, but recommended that services continue. *Id.* Fisher had met with

the psychologist and was working with the in-home coach. *Id.* Again, no services were suggested or provided for Morrison. *Id.* A hearing on the review was held on April 3, 2012. R. 49. The trial court ordered that C.F. remain in Fisher's custody and the case plan be approved. *Id.*

{¶8} On April 11, 2012, the psychological evaluation of Fisher was filed with the trial court. The report indicated that Fisher had low mental functioning and had been a victim of sexual abuse herself. However, the report concluded that with proper therapy, Fisher could parent C.F. The Agency then filed a motion to amend the case plan to required psychological counseling for Fisher due to the results of the evaluation. R. 52. The Agency also requested an order prohibiting Fisher or her children from having any contact with sex offenders. *Id.* A hearing was held on the motion on June 5, 2012. R. 56. The trial court granted the motion after the parties all agreed with the amendments. *Id*

{¶9} On August 31, 2012, the third semiannual administrative review was conducted. R. 57. The review indicated that progress was being made, but raised some new concerns. *Id.* The review stated that Fisher and C.F. were now living with Fisher's sister, and that C.F.'s behavior was much better. *Id.* Fisher was attending her counseling, but was frustrated with her employment and housing situation. *Id.* The review also indicated that C.F. was still struggling with behavior issues and with following rules. *Id.* The Agency indicated that if

Fisher's housing situation was not resolved, it would be looking for relative placements, but no changes were recommended at that time. *Id*. Still, no services were suggested for Morrison. *Id*. A hearing was held on the review on October 4, 2012. R. 60. The case plan was approved and ordered. *Id*.

{¶10} On November 29, 2012, the Agency filed a motion for an ex parte emergency temporary custody order. R. 61. The change of custody was requested due to a new report of abuse against C.F. by Robb North ("North"), with whom Fisher was living. *Id*. The motion was granted and a hearing was set for December 3, 2012. R. 62. Following the hearing, the trial court ordered that C.F. be placed in the temporary custody of the Agency. R. 71. A new case plan was filed on January 14, 2013. R. 73. The new case plan added services for Andrew Hughes ("Hughes"), Fisher's fiancé. *Id*. However, no services were added for Morrison. *Id*.

{¶11} On January 22, 2013, Morrison filed a motion for custody of C.F. R. 74. On January 28, 2013, the Agency had to move C.F. from her foster home to one that did not have younger children or boys due to her behavior. R. 77. A new case plan was filed to accommodate this change. *Id*. The new case plan did finally allow Morrison to have visitation with C.F. *Id*. On April 17, 2013, Morrison filed a motion for a home study. R. 83. On May 16, 2013, a letter from Crawford County Job and Family Services was filed denying approval of

-6-

Morrison's home study due to a "substantiated neglect case in September 2011 with other adults living in the home." R. 86.

{¶12} A semiannual administrative review was held on February 27, 2013. R. 80. The review indicated that C.F. had regressed in her progress with her behavior problems escalating, which resulted in a finding that insufficient progress was being made. *Id.* The review indicated that a home study of Morrison's house had been requested and that Morrison was attending visits an average of once a month instead of every other Monday. *Id.* However, again no services were ever listed for Morrison. *Id.* The Agency did make the following statement in its summary: "[Morrison] has filed for custody, however, due to the counseling recommendations that [C.F.] not reside with children of a younger age or old boys the agency will not be in support of this." *Id.* A hearing was held on this review on March 7, 2013. R. 88. Morrison was present and agreed to the case plan submitted by the Agency. *Id.*

{¶13} On May 31, 2013, the guardian ad litem ("GAL") submitted her report. R. 93. In the report, she made the following determination.

> **I have met all the parties in this case except [Morrison], father of [C.F.]. Since [C.F.'s] behavior poses a threat to younger children and [Morrison] has two, I believe that it is not in either his or [C.F.'s] best interest to see him as a viable candidate for custody.**

*Id.* On June 6, 2013, an amended case plan was submitted to the trial court. R. 95. The new case plan addressed a change of custody for C.F.'s brother, who is not a party to this appeal. *Id.* Again, the only mention of Morrison in the case plan is that he was allowed supervised visitation with C.F. *Id.* No services for Morrison were addressed. *Id.*

{¶14} Another amended case plan was submitted on August 12, 2013. R. 102. The changes to the case plan included removing Hughes from services due to the termination of his engagement to Fisher, the granting of custody of C.F.'s brother to his father, and the addition of protective daycare for the brother. *Id.* The only mention of Morrison was that he was permitted to visit with C.F. one to two times a month. *Id.* The Agency again noted that it was "still looking into [Morrison] and any concerns that may be present." *Id.*

{¶15} On August 15, 2013, the Agency held a semiannual administrative review of the case plan. R. 104. In this plan the Agency did finally address Morrison's involvement. *Id.*

> **[C.F.'s] father [Morrison] has filed a motion for custody which is scheduled to be heard on August 15, 2013. The agency is not in support of [Morrison] receiving custody due to [C.F.'s] counselor recommending that [C.F.] not be placed in a home with younger children due to her sexually acting out behaviors. The agency also has concerns with [Morrison's] lack of interaction with [C.F.] that has been observed during visitation. [The Agency] did request that a home study be completed on [Morrison's] home. [Morrison's] home study was denied due to**

> **[Morrison] having other adults who reside in his home that have a history with Children Services.**
>
> **Julie Morrison – Paternal Aunt of [C.F.] has expressed a desire to obtain custody of [C.F.]. [The Agency] has instructed Julie to notify the agency of when she would like a home study completed. Julie has yet to do this as she is trying to find appropriate housing.**

*Id.* Once again, the Agency did not recommend any services for Morrison. *Id.* This case plan was approved by the trial court on August 28, 2013. R. 107.

{¶16} On August 15, 2013, a hearing was held on Morrison's motion for custody of C.F. R. 108. At the conclusion of the hearing, the trial court denied the motion. *Id.* However the trial court did order an increase in the visitation between C.F. and Morrison. *Id.*

{¶17} On January 2, 2014, the Agency filed its motion for permanent custody of C.F. R. 111. As to Morrison the motion made the following allegations.

> **Additionally, [the Agency] requested that Crawford County Children Services perform a home study for [Morrison], natural father of C.F. Crawford County Children Services did not approve his home study due to a substantiated neglect case in September 2011 with other adults living in the home. There are also concerns with C.F. being placed in a home with younger children, per her therapist, Christian Coblentz.**

*Id.* Morrison then filed a motion for permanent custody of C.F. on January 29, 2014. R. 126.

**{¶18}** The Agency conducted its semiannual administrative review on February 7, 2014. R. 131. In the review, the Agency indicated that Fisher had made some progress in her counseling, but still lacks stable housing. *Id.* The Agency did not address any services for Morrison, but instead merely stated that placing C.F. with him was not supported due to his having younger children and the denial of his home study by Crawford County. *Id.* A hearing was held on the review on February 13, 2014. R. 133. The trial court approved the case plan as submitted. *Id.*

**{¶19}** On April 16, 2014, the GAL submitted her report. R. 137. She reported that C.F. indicated that she does not really know Morrison and "does not have anything to talk about with him." *Id.* The GAL said that she had met with Morrison and observed his visit with C.F. *Id.* Morrison had limited reading skills, which prohibited him from helping C.F. with her homework. *Id.* The GAL also visited Morrison's home where he lives with his two children under the age of four, his girlfriend, and his girlfriend's mother. *Id.* The home was described as a double wide trailer with two bedrooms, two bathrooms, and a storage area Morrison planned on turning into a bedroom for C.F. *Id.* Morrison claimed that his social security income would be sufficient to support C.F. *Id.* Based upon all of the information the GAL had reviewed, she made the following recommendation regarding Morrison.

> **[C.F.'s] biological father, [Morrison] has been declared an ineligible candidate by both Crawford County and Shelby County Children Services by virtue of a case involving his household and the fact that there are small children in his household. As a result, I recommend that Children Services receives permanent custody of [C.F.].**

*Id.*

{¶20} A hearing on the Agency's motion for permanent custody of C.F. and Morrison's motion for legal custody of C.F. was held on April 24 and 25, 2014. R. 163. The Agency presented multiple witnesses, but most of them had only had interactions with Fisher, not with Morrison. Christian Coblentz ("Coblentz") testified that she was the therapist for C.F. from August of 2012 through the hearing. Tr. 98. Coblentz testified that C.F. had been diagnosed with an adjustment disorder due to her history of sexual abuse. Tr. 99. C.F. had also been diagnosed with cyclothymic disorder which causes frequent mood swings. Tr. 100. When Coblentz first started treating C.F., she recommended to the Agency that C.F. not be placed with younger children or other male children due to her sexually acting out behavior. Tr. 105-106. Coblentz testified that C.F. had made progress, but had "a ways to go before she's, um, capable of understanding what those boundaries are." Tr. 107. Coblentz described C.F. as being "very sexualized for her age. Tr. 108. Coblentz also testified that C.F. had problems following rules and has had issues with self-harming behavior. Tr. 114-15.

According to Coblentz, C.F. never had anything negative to say about her visits with Morrison, but did indicate that there was a lack of interaction at times between the two of them. Tr. 116. Coblentz indicated that since C.F. has been in a stable home, her emotional stability has increased. Tr. 116. C.F. has told Coblentz that she would like to live with Fisher because she knows her better than Morrison. Tr. 118. Coblentz indicated that C.F.'s emotional state at the time of the hearing did cause a risk that she would sexually act out towards younger children or male children. Tr. 120. Coblentz's recommendation was that C.F. continues counseling. Tr. 120.

{¶21} On cross-examination, Coblentz admitted that she did not know what the interaction between Morrison and C.F. was like prior to her being placed in foster care. Tr. 127. Coblentz also testified that she really did not discuss C.F.'s relationship with Morrison because her focus was on treating the results of the abuse. Tr. 128. She testified that C.F. mentioned that she did not know Morrison well, so C.F. was uncomfortable around him in the first few visits. Tr. 128-29. Coblentz also admitted that she did not know Morrison well enough to be able to give a recommendation concerning placement with him. Tr. 137. Coblentz did testify that if C.F. were to be placed with Morrison, there would need to be precautions taken to make sure that C.F.'s behavior towards Morrison's younger children was appropriate. Tr. 139. When questioned by the judge, Coblentz

-12-

testified that based upon C.F.'s history, her behavior could become a problem in Morrison's home. Tr. 144.

{¶22} The Agency also presented the testimony of Tim Stauffer ("Stauffer"), who is the foster father of C.F. Tr. 150. Stauffer described C.F. as a strong-willed and challenging child who pushes the boundaries set for her. Tr. 150-51. Stauffer also testified that while C.F. has been living with him, he has not witnessed any sexually acting out behavior. Tr. 154. According to Stauffer, C.F. only sees Morrison every other week or so, and does not seem to care about the visits. Tr. 155. C.F. reported that during the visits with Morrison, he frequently spent more time tending to his toddler son than interacting with her. Tr. 155-56. Morrison did not ignore her, but the interaction was limited. Tr. 156. Stauffer testified that if C.F. was available for adoption, he and his wife would consider adopting her. Tr. 156. On cross-examination, Stauffer testified that he did not know Morrison other than saying hello at visits. Tr. 161. Stauffer also testified that he and his wife had provided respite care for younger children while C.F. was in the home and no issues arose. Tr. 166-67. When questioned about a placement with Morrison, Stauffer testified that he did not foresee any issues with that other than the fact that C.F. requires "a firm hand." Tr. 171.

{¶23} Paula Zimmerman ("Zimmerman") testified that she was assigned to the case by CASA on May 3, 2013. Tr. 175. Zimmerman made a home visit to

Morrison's home in March of 2014. Tr. 176. According to Zimmerman, Morrison's home is a "double-wide" with three bedrooms, a kitchen and a living room. Tr. 176. At the time of the visit, two of the bedrooms were occupied by family members and the third was being used as a storage room. Tr. 176. The home was occupied by Morrison, his girlfriend, their two children who were almost four and under two, and the girlfriend's mother. Tr. 176. Morrison, his girlfriend, and the youngest child have one bedroom, while the girlfriend's mother and the older child share the second bedroom. Tr. 177. The third bedroom was described as "a dark unfinished room" with a door that sticks. Tr. 177. The home was described as "well lived in" with things covering most of the surfaces. Tr. 178.

{¶24} Zimmerman also testified that she had observed a visit between Morrison and C.F. at a playground in July of 2013. Tr. 178. At the visit, Zimmerman spent most of the time speaking with C.F. while Morrison spoke with the in-home coach. Tr. 178. She described the interaction as non-existent. Tr. 178. When Morrison and one of his other, younger children visited with C.F., Morrison gave most of his attention to the toddler or his infant sons rather than C.F. Tr. 179. Zimmerman also testified that Morrison's sole source of income was social security, though Morrison believes that his income would be sufficient to take care of C.F. Tr. 180. Zimmerman did not believe that Morrison's

residence had sufficient space for C.F. Tr. 180. According to Zimmerman, C.F. has told her that she would prefer to live with Fisher and her brother, but C.F. did not seem to know what her options were. Tr. 185.

{¶25} On cross-examination, Zimmerman testified that Morrison's home did have a small bedroom set aside for C.F. Tr. 190. However, Zimmerman felt there were too many people living in the small home. Tr. 190. Zimmerman admitted that there were conclusions of her report as to Morrison's ability of which she had no direct knowledge, but was relying upon statements made by third parties. Tr. 192. Zimmerman also admitted that her recommendation that C.F. not be placed with Morrison due to his having small children in the home came solely from the recommendation of Coblentz. Tr. 193. Although Zimmerman questioned Morrison's ability to provide for C.F. financially, she had never asked to see his finances, but assumed that he could not due to his only income being social security. Tr. 193-94. Zimmerman also admitted that when she had observed no communication between Morrison and C.F. at a visit, she was not present for the full visit. Tr. 194. The visit was two hours long, but she was only present for approximately 45 minutes. Tr. 195. On redirect, Zimmerman testified that C.F.'s room in Morrison's home had a bed. Tr. 196.

{¶26} Janice Geise ("Geise") testified that she was the in-home coach for Fisher since February of 2013 and Morrison since May of 2013. Tr. 202. The

visits between Morrison and C.F. had limited interaction and Morrison was not able to help C.F. with her homework because of his limited intellectual abilities. Tr. 202-203. When questioned about how Morrison would help C.F. with her homework if he had custody, Morrison stated that he would get her a tutor, but Geise did not think that would be financially possible for him. Tr. 203. During some of the visits, Morrison would bring his toddler son or his mother or his sister. Tr. 203. The best interaction was between C.F. and Morrison's sister. Tr. 204. Geise testified that she had suggested some topics he could discuss with C.F. during the visits and there had been some improvements. Tr. 204. Visits were scheduled with Morrison every other week, but were reduced to once a month in July and August of 2013 due to Morrison missing visits. Tr. 204. Morrison claimed he could not come to the visits due to transportation issues. Tr. 205. In September of 2013, the visits were returned to every other week. Tr. 204. Since September, Morrison had seventeen visits scheduled and attended ten. Tr. 205. Morrison had a hard time talking to C.F. because he did not know what to say. Tr. 205. Geise testified that in an attempt to improve the visits, she wrote a letter to Morrison giving him a list of topics. Tr. 206. Morrison seems to talk about the same thing at every visit. Tr. 206. When Morrison does not interact with C.F., her response is to just to eat her supper and not say anything. Tr. 207. When Morrison would bring his toddler, he would spend most of the visit paying

attention to him due to the child's special needs. Tr. 207. Morrison told Geise that he does not know what to do with a daughter as he has never had one. Tr. 207.

{¶27} Geise testified that she went over budgeting with Morrison. Tr. 208. Morrison received approximately $1,000 a month and from that he makes two car payments for approximately $700 a month and spends approximately $100 a month in groceries. Tr. 209. His girlfriend or her mother pays all the other bills. Tr. 209. Morrison's mother controls his finances. Tr. 209. Geise does not believe that Morrison is capable of managing his own finances due to his lower intellectual functioning. Tr. 211. Geise was concerned that if Morrison were to receive custody of C.F., she would not get the attention she needs because Morrison has two other children with special needs, that Morrison would not be able to help her with her homework, and that Morrison could not afford to get her a tutor to help her with her homework. Tr. 211. Geise also had concerns regarding Morrison's parenting abilities because he does not know how to discipline C.F.[1] Tr. 212. Geise testified that Morrison was forgetful and did not always remember when his visits were scheduled, so would call to ask. Tr. 212-13. Finally Geise testified that there was no bond between C.F. and Morrison and they do not show affection towards each other. Tr. 213. Morrison did not come to

---

[1] Interestingly, Geise indicates all these concerns about Morrison, but the Agency did not list any concerns on the case plan or offer parenting classes or budgeting classes to Morrison.

the Christmas visit with C.F. because he thought it was a waste of time since the Agency would not give him custody. Tr. 214. Morrison's mother and sister did come to that visit. Tr. 214. Geise testified that Morrison is difficult to converse with because he repeats himself a lot and tends to need her to repeat what she is saying as he does not seem to understand it. Tr. 214-16.

{¶28} On cross-examination, Geise admitted that Morrison has $200 a month left over after his expenses. Tr. 245. However, she indicated that if Morrison were to move out of his home with his girlfriend, he would not have enough money to support C.F. Tr. 246. She testified that although Morrison had 23 visits scheduled since January of 2013, he had only attended 13 of the visits. Tr. 248. However, none of the visits were missed without explanation. Tr. 249. Geise testified that Morrison lived a long distance away and sometimes had car trouble.[2] Tr. 249-50. When Morrison came to the visits, he brought C.F. dinner, but it was fast food that he picked up on his way to the visits. Tr. 250. When C.F.'s half-brother came with Morrison, C.F. would interact with them some, but not much due to the limitations of the boy. Tr. 250. Geise also admitted that Morrison has the ability to parent the children and that he had made some progress. Tr. 251. When questioned whether Morrison would be able to establish a relationship with C.F., Geise testified as follows.

---

[2] Notably, the Agency never added any transportation assistance to the case plan which may have allowed Morrison to make more visits. Morrison resided in Bucyrus, while the visits occurred in Shelby County.

**He's - - he's not consistent with the - - with ideals that I pose, so I would say no.**

Tr. 251.

{¶29} Candi Mitchell ("Mitchell") testified that she was the family coach from January of 2013 until June of 2013. Tr. 259. Mitchell observed the visits between Morrison and C.F. Tr. 262. During the visits, Morrison generally did not play or talk with C.F. Tr. 264. At the visits where Morrison's mother and sister came, they would interact with C.F. while Morrison took care of his son. Tr. 265. Mitchell testified that Morrison "needs some help in making decisions and choices for himself and directions at times and has a tough time focusing." Tr. 268. Mitchell stated that C.F. did not seem to react in any way to the visits, that when Morrison arrived, she would continue with her current activity. Tr. 275. According to Mitchell, she did not believe that Morrison could be a parent to C.F. because he did not make an effort to get to know her. Tr. 277. With C.F.'s history, she would need more positive interaction and constant supervision than what Morrison would provide. Tr. 278.

{¶30} Jessica Meyer ("Meyer") testified that she was the ongoing caseworker for this matter. Tr. 280. Meyer testified that prior to the Agency receiving temporary custody, Morrison had expressed an interest in terminating his rights due to the fact that Fisher had not allowed him visitation with C.F. even

though he was paying child support. Tr. 316. After the Agency received temporary custody, Morrison decided he would like to have custody of C.F. Tr. 317. She requested a home study by Crawford County since Morrison lives in Bucyrus. Tr. 318. The home study was denied on the grounds that there had been a substantiated claim of child neglect by an adult residing in his household. Tr. 318. Meyer admitted that she has not seen any visits between C.F. and Morrison, but indicated that she had been told that there was a lack of interaction. Tr. 323. Meyer testified that the Agency could not allow a placement with Morrison because his home study had been denied, unless he was willing to move to a new place without his girlfriend and their children. Tr. 327-28. Meyer admitted that the Agency did not offer Morrison any assistance in finding a new place to live. Tr. 328.

{¶31} On cross-examination, Meyer testified that the Agency had considered Morrison as a potential placement for C.F., but that ended with the home study was denied. Tr. 353. Meyer testified that the home study was denied without even a visit to the home due to the substantiated case of neglect from 2011. Tr. 355. The background check of Morrison showed no issues. Tr. 356. According to Meyer, the Agency would never allow Morrison to take custody of C.F. without an approved home study. Tr. 357. Meyer admitted that she had never been to Morrison's home and was basing her decision solely upon the letter

from Crawford County. Tr. 358. After Meyer's testimony, the Agency rested its case.

{¶32} Morrison presented the testimony of two witnesses. The first was Mary Morrison ("Mary"), who was Morrison's mother and C.F.'s paternal grandmother. Tr. 387-88. The first time Mary met C.F. was at C.F.'s seventh birthday party to which Fisher had invited her. Tr. 388. Mary testified that she had visited with C.F. approximately twice a month since she was placed in the temporary custody of the Agency, but with the bad weather in the winter,[3] she had not been able to attend all of the scheduled visits. Tr. 389. Mary testified that Morrison lives in a three bedroom trailer that is kept clean. Tr. 390. Besides Morrison, Morrison's girlfriend, her mother, their son and their daughter live in the home. Tr. 391. Mary describes the little boy as having a problem talking, but indicated that Morrison has taught him sign language and that he goes to therapy. Tr. 391-92. Whatever the children need, Morrison manages to meet those needs. Tr. 392. Mary testified that when Morrison first started visiting with C.F. it was difficult because he did not know what to say or how to act with her given her situation. Tr. 392-93. However, the recent visits have been better. Tr. 393. Mary described how at a recent visit, Morrison had taken a bat and ball with him to the visit and played ball with C.F. Tr. 393. Additionally, Morrison has started

---

[3] The winter of 2013-2014 was very cold, very snowy, and conditions were frequently not good for travel.

playing on the playground with her and playing board games with her. Tr. 393. Mary admitted that Morrison was not able to help C.F. with her homework due to his limitations, but that his sister was able to do so. Tr. 395. Mary also admitted that due to the limited time they have had to get to know C.F., the girl does not have a close relationship with Morrison, but she does show some affection. Tr. 397. Prior to C.F. being in the custody of the Agency, Morrison did not get to see her because Fisher refused to allow him visits. Tr. 398. Mary indicated that given more time, the relationship between Morrison and C.F. would grow. Tr. 405.

{¶33} On cross-examination, Mary testified that Morrison did not learn about C.F.'s existence until Fisher applied for public assistance. Tr. 406. After they learned of C.F.'s existence, Morrison stayed away to avoid fights with Fisher. Tr. 409. When questioned about Morrison's ability to pay a tutor, Mary indicated that she would help pay for it if Morrison needed her to do so. Tr. 412.

{¶34} Morrison then testified on his own behalf. Morrison testified that he lives in Bucyrus with his girlfriend, her mother, his three year old son, and his one year old daughter. Tr. 422-23. As to education, Morrison testified that he finished the eleventh grade, but did not graduate and has not earned a GED. Tr. 424. Morrison indicated that his physical health was good and that he had never been diagnosed with a mental disorder. Tr. 425-26. Morrison testified that his only source of income is social security. Tr. 427-28. When questioned about his

finances, Morrison indicated that his bills were paid, that he has two car payments, and pays child support. Tr. 429. Neither of the cars is driveable and he has not had a working vehicle since December of 2013. Tr. 429. Morrison described his home as a double-wide trailer with three bedrooms and two bathrooms. Tr. 433. His daughter sleeps in the room he shares with his girlfriend, but has her own bed. Tr. 435. His son sleeps in the same room as his grandmother, but likewise has his own bed. Tr. 435. The third bedroom has a bed designated for C.F. Tr. 436. He has lived in that home with his girlfriend since 2006 or 2007. Tr. 433. At times, Morrison gets frustrated with his relationship and considers moving out, but has never done so. Tr. 434-35.

{¶35} Morrison testified that he had a long distance relationship with Fisher. Tr. 438. He first learned about the existence of C.F. or that Fisher had even been pregnant when C.F. was seven. Tr. 438. When he learned about C.F., he was surprised and happy. Tr. 439. He tried to work out visitation with Fisher, but she did not allow him to see C.F. Tr. 440. He first became involved with C.F. once the Agency took temporary custody of C.F. Tr. 441. The initial visits with C.F. occurred in the school building after school. Tr. 442. At that time, Morrison had mixed emotions, but he tried to hide them. Tr. 442.

> **Well I mean I was like happy and kind of sad at the same time, you know. I just wanted to break down and cry but I wouldn't do it.**

Tr. 442. Morrison testified that he did not know how to talk to or interact with C.F. when he first started visiting. Tr. 443. This was due to C.F.'s age when he met her and her prior history of abuse. Tr. 443. Morrison testified that if C.F. were placed in his care, he would keep a "really good eye" on her to make sure she was not abused again. Tr. 444. When questioned about the fact that Morrison has missed visits, he indicated that he had issues with transportation and the bad weather. Tr. 445-46. Morrison also testified that he had not moved because he had two other children to care for as well and he could not just leave them. Tr. 446. Morrison feels that with additional time, he could form a relationship with C.F. Tr. 451. He indicated that he had repeatedly asked for overnight visits, but they were declined because of C.F.'s history. Tr. 452. When questioned concerning the substantiated claim of neglect in 2011, he indicated that the issues were resolved and he never lost custody of his son, who was the child claimed to be neglected. Tr. 454-55.

{¶36} On cross-examination Morrison testified that he did not arrange for visits prior to C.F. entering the custody of the Agency because he did not know how to do so. Tr. 459. Morrison admitted that he had once told Meyer that he wanted to give up his parental rights so that he did not have to pay child support. Tr. 462. Morrison claimed that he did so because he "was upset, frustrated, and

-24-

just beyond the point where [he] didn't want to deal with anything anymore." Tr. 462.

{¶37} On May 16, 2014, the trial court entered its judgment granting the Agency's motion for permanent custody. R. 163. Morrison filed his notice of appeal on June 4, 2014. R. 164. On appeal, Morrison raises the following assignment of error.

> **The trial court erred in terminating the parental rights of [Morrison].**

{¶38} The right to raise one's own child is a basic and essential civil right. *In re Murray* (1990), 52 Ohio St.3d 155, 556 N.E.2d 1169. "Parents have a 'fundamental liberty interest' in the care, custody, and management of their children." *In re Leveck*, 3d Dist. No. 5-02-52, 5-02-53, 5-02-54, 2003-Ohio-1269, ¶6. These rights may be terminated, however, under appropriate circumstances and when all due process safeguards have been followed. Id. When considering a motion to terminate parental rights, the trial court must comply with the statutory requirements set forth in R.C. 2151.414. These requirements include, in pertinent part, as follows.

> **(B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child**

**to the agency that filed the motion for permanent custody and that any of the following apply:**

**\* \* \***

**(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period \* \* \*.**

**For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to [R.C. 2151.28] or the date that is sixty days after the removal of the child from home.**

**\* \* \***

**(C) In making the determination required by this section \* \* \*, a court shall not consider the effect the granting of permanent custody to the agency would have upon any parent of the child. A written report of the guardian ad litem of the child shall be submitted to the court prior to or at the time of the hearing held pursuant to division (A) of this section \* \* \* but shall not be submitted under oath.**

**\* \* \***

**(D)(1) In determining the best interest of a child at a hearing held pursuant to division (A) of this section \* \* \*, the court shall consider all relevant factors, including, but not limited to, the following:**

**(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;**

**(b)   The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;**

**(c)   The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period * * *;**

**(d)   The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;**

**(e)   Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.**

R.C. 2151.414.

**{¶39}** A review of the record raises questions for this court:  If the Agency was so concerned about Morrison as a parent, why was he never added to the case plan for services?  The record appears to indicate that the Agency looked at Morrison more as a relative placement than as a parent.  For example, the Agency workers testified that once Morrison's home study was denied for a prior claim of neglect, they no longer considered him to be an appropriate placement.  This may be a valid viewpoint for a relative placement who has no right to custody of a child, but it is not the appropriate standard when dealing with a parent who has a fundamental right to raise his child.  If the standard for granting custody to the Agency were that a parent had a substantiated case of neglect, then most parents whose children are removed would automatically lose custody of their children

-27-

because that is exactly why the Agency is involved with the family. The Agency workers testified that they did not investigate the substantiated claim, but merely relied upon a letter from Crawford County saying there was a substantiated claim of neglect by an adult in the household in 2011. The letter did not address what the claim was, who was the perpetrator, what actions were taken, or what the result was. From Morrison's testimony, we learned that there was a substantiated claim and his son was removed from the home for a week or so before the situation was remedied and he was returned to the home. We know from the testimony of Morrison and the Agency that the son had been returned to Morrison and his girlfriend and was living with them at the time of the hearing. We know that the letter did not indicate that there was any ongoing case. We also know that the Agency determined that there were no issues with Morrison's parenting of his son that caused them any concerns. The only solution the Agency offered Morrison was that he could move out on his own and request a new home study. His failure to do so was cited as a lack of true desire to parent C.F. However, the Agency admitted that Morrison probably did not have the finances to move out on his own and also admitted that they did not offer him any assistance in finding housing or applying for financial assistance. Instead, the Agency merely left Morrison to figure it out on his own. Additionally, the suggestion that Morrison just move out placed him into a situation where he would be required to leave his

other children in order to have a mere chance that the Agency might agree to allow him to have custody of C.F. No parent should be made to choose between their children.

{¶40} Other issues raised by the Agency included Morrison's lack of education and low intelligence interfering with his ability to help C.F. with her homework. The Agency repeatedly indicated that Morrison had low intellectual functioning, but when questioned about what his functioning level was, were unable to answer. The reason the Agency did not know the answer was because the Agency did not bother to find out. They did not request any psychological testing for Morrison or make any attempt to determine if the situation was one that could be remedied. The Agency indicated that he was not intelligent enough to manage his own finances and that his mother paid his bills. If his intellectual capacity was so low as to prevent him from functioning as a parent, why did the Agency not address the problem and appoint a guardian ad litem for Morrison?

{¶41} Likewise, the Agency based its case on the fact that Morrison had no relationship with C.F. The evidence clearly showed that Morrison did not even know C.F. existed until she was seven years old and even then Fisher did not allow visitation while she still had custody of C.F. Morrison testified that he did not push the issue because he did not want to make the situation with Fisher worse. Once the Agency obtained temporary custody, Morrison requested

visitation and it was granted. However, Morrison did not know how to interact with C.F., not only because of her age and the fact that she was a stranger, but also because of her past history of multiple instances of sexual abuse. Although the Agency did provide a coach during the visitations to assist him, that was the sole extent of the assistance. Geise testified that she went so far as to send him a letter which suggested topics he could discuss. Morrison was not offered any counseling either separately or with C.F. to help him come to terms with the abuse and to teach him how to work with C.F. Again, Fisher was offered all of these things, so why not Morrison? Additionally, Morrison was only offered twice a month visits and lived a long distance from where the visits occurred. He had unreliable transportation, which caused him to miss some of the visits. The Agency offered no assistance in making the visits work. The case plan did not provide for any phone contact between C.F. and Morrison either.

{¶42} The Agency was concerned about Morrison's financial situation in that he was only receiving social security income. However, the Agency did not know his financial situation because they never asked for details of the income for his household or for his expenses. The Agency did not know about his capacity to work, again because they did not investigate. The Agency did not know if he received food stamps or was receiving Medicaid. Instead of offering budgeting classes or advising Morrison how to access services that might have assisted him

in changing his predicament, the Agency left Morrison to his own devices to try and solve the problem. Additionally, the Agency did not feel this was a concern that needed to be addressed in any of the case plans.

{¶43} From the beginning, Morrison's involvement was C.F. was ignored. The Agency made no efforts to help foster a relationship between C.F. and Morrison while she was in Fisher's custody. The only mention of Morrison was that he was the father of C.F. Once the Agency took custody of C.F., that involvement barely changed. The Agency did allow visitation and provided coaching at that visitation, but Morrison's role as C.F.'s father was not seriously considered as one of a parent, but rather only as a potential relative placement. Other than the provision for allowing visitation with Morrison, the only mention of Morrison on any case plan was to note that he had requested custody of C.F., but the Agency would not agree due to the denied home study and the fact that Morrison had two younger children in the home. Both of these issues were ones that should have been addressed by the Agency and attempts should have been made to resolve them. Morrison could have been offered parenting classes to help him understand what it would take to parent C.F. due to her background and what steps would be necessary to protect the younger children. The Agency should have investigated the home to determine what the substantiated claim was and whether it was ongoing. Instead, the Agency appeared to have made a

determination at the beginning that he was not an appropriate placement and stopped there without any additional efforts made. Again, while this might be appropriate if Morrison were a non-parent relative, it is not the proper view to take for the father. The lack of effort by the Agency to return C.F. to a parent is extremely troubling to this court. No parent should be denied the fundamental right to parent his or her child without the Agency making reasonable efforts to prevent the termination of parental rights. When reasonable actions could be taken, the Agency should not be allowed to do nothing and just wait for the child to be in the Agency's temporary custody for twelve months so that it can move to terminate the parental rights of the parent.

{¶44} However, as troubling as the Agency's inactions are, the standard of review for this case is whether the trial court abused its discretion in determining that it was in C.F.'s best interests to terminate Morrison's parental rights. The determination whether to grant a motion for permanent custody requires a two-step approach. *In re G.B.*, 10th Dist. Franklin No. 04AP-1024, 2005-Ohio-3141, ¶ 13. The first step is to determine whether one of the factors set forth in R.C. 2151.414(B)(1) apply. *Id.* If one of those circumstances apply, then the trial court must consider whether granting the motion is in the best interest of the child by considering the factors set forth in R.C. 2151.414(D). *Id.*

**{¶45}** The trial court first found that C.F. had been in the temporary custody for more than twelve months out of the twenty-two consecutive months prior to the filing of the complaint for permanent custody. This is the factor set forth in R.C. 2151.414(B)(1)(d). Thus, the only consideration for the trial court in this case was whether the granting of the Agency's motion was in the best interest of C.F. The trial court in this case considered all of the factors in R.C. 2151.414(D). The trial court determined that C.F.'s relationship with Morrison was "awkward and distant." The relationship between C.F. and the foster father was determined to be positive. C.F. had indicated that C.F. wanted to live with her brother more than anyone else, but otherwise did not seem to care where she lived. The trial court found that C.F. needed a secure and permanent placement which she could not get from her parents.[4] Based upon these findings, the trial court found that it was in the best interest of C.F. to be placed in the permanent custody of the Agency and terminated the parental rights of Morrison and Fisher. A review of the record shows that there is competent, credible evidence to support the findings made by the trial court. Thus, this court cannot find that the trial court abused its discretion. The assignment of error is overruled.

---

[4] This court notes that the trial court referenced the mental health issues of both parents, but there was no testimony concerning mental health issues of Morrison, only Fisher, because Morrison was not requested to submit to any testing.

-33-

{¶46} Having found no prejudicial error in the particulars assigned and argued, the judgment of the Court of Common Pleas of Shelby County, Juvenile Division, is affirmed.

**_Judgment Affirmed_**

**ROGERS and SHAW, J.J., concur in Judgment Only.**

**/jlr**